**FILED**

JUN **2 6** 2008

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---

RICHARD JOSEPH FINLEY

        Plaintiff,

vs.

UNITED STATES OF AMERICA

        Defendant.

)
)
)
)
)
)
)
)
)
)

No. 07-cv-01939-DLJ EFB
No. 98-cr-00460-DLJ

**ORDER**

---

On July 11, 2007, Richard Joseph Finley (Finley) filed a claim for unjust conviction and imprisonment in the United States Court of Federal Claims, pursuant to 28 U.S.C. § 1495. At the direction of that Court Finley filed a request for a Certificate of Innocence with this Court, pursuant to 28 U.S.C. § 2513, on July 26, 2007.

Based upon extensive briefing and multiple appearances before this Court, Finley has now presented a full evidentiary record and relevant arguments in support of his request. The United States has been given an equal opportunity to present evidentiary material and relevant argument in response to his request. Both parties have indicated to the Court that they have no further evidence or argument that they wish the Court to consider on the matter. Having considered the evidentiary record, the briefs and the oral arguments presented by both

1  parties, and the applicable law, the Court DENIES the request by

2  Finley for a Certificate of Innocence.

3

4                          **FACTUAL BACKGROUND**

5      In an opinion published August 20, 2002, the Ninth Circuit

6  summarized the factual background of this case as follows:

7          Finley owned a law bookstore and ran a bar review
       course for students of non-accredited law schools.   In
8      1992, Finley began looking for investors to assist him
       in opening a chain of approximately twenty bookstores
9      across the United States.  Finley could not obtain
       traditional bank financing because of a dispute he had
10     with the IRS over a large tax claim.
           In November 1995, a customer mentioned that he had
11     attended an investment seminar in Montana run by Leroy
       Schweitzer.[1]  Inspired by this suggestion, on December
12     22, 1995, Finley went to Schweitzer's farmhouse in
       rural Montana to attend the so-called investment
13     seminar.  Schweitzer explained that he possessed
       recorded liens against Norwest Bank of Montana, other
14     banks, and individuals, and that he could draw on these
       accounts by issuing negotiable instruments.
15         At the conclusion of the seminar, each attendee
       received a five-minute audience with Schweitzer to
16     explain the attendee's needs.  When he met with
       Schweitzer, Finley explain his business plan to open a
17     chain of bookstores.  Finley also told Schweitzer that
       he owed the IRS about $180,000 and that he owed a
18     mortgage on his condominium with Great Western Bank.
           Schweitzer gave Finley several documents that
19     looked like financial instruments and were entitled,
       "Comptroller's Warrants" and "Certified Banker's
20     Checks."  Schweitzer made one document payable to
       Finley and the Bank of America for $6,125,000, Finley's
21     estimate of the cost of starting his bookstore chain.
       Schweitzer made the second document out to Finley and
22     Great Western Bank for $150,000, or about twice the
       remaining amount Finley owed on his mortgage.   The
23     third instrument named the IRS and Finley as payees for
       $360,000, twice the amount Finley owed in taxes.
24     Although nothing existed in writing, Finley understood
       that Schweitzer would receive thirty-five percent of
25     the profits from the bookstores.

                              2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

        Finley returned to Sacramento, California with the
documents and prepared to open his new bookstores.  He
attempted to deposit the $6 million document with the
Bank of America in late December 1995 and again in
August 1996.  Finley gave the Bank of America documents
to an officer who had handled Finley's business
accounts for several years.  The bank began processing
the instrument, but it was returned marked "fictitious
check" with a separate notice that indicated "please
resubmit when corrections are made."  The bank also
contacted the post office and received a "fraud alert"
addressing similar instruments from Schweitzer.  The
bank gave a copy of the alert to Finley.  Nonetheless,
Finley attempted to negotiate the instrument a second
time in August 1996.  This time Finley told the bank to
send it to a designated address, but the item came back
unpaid again.

        Similarly, on January 2, 1996, Finley attempted to
use the $152,000 document to pay off his real estate
mortgage with Great Western Bank.  Finley included a
note indicating the failure to refund the excess amount
would constitute criminal conversion.  Great Western
did not negotiate the instrument because the bank had
prior knowledge of fraud alerts regarding Schweitzer
instruments.[2]

        On January 5, 1996, the chief of the fraud section
of the Office of the Comptroller of the Currency wrote
Finley stating that the Schweitzer document was "not a
valid obligation of the federal government; the special
account number is not an account for redemption of
payment of such an instrument; the format is not one
used by the federal government" and advised Finley to
contact the FBI.

        Undeterred by this information, Finley mailed the
$360,000 document to the IRS Center in Ogden, Utah on
January 17, 1996.  Finley included a letter requesting
"immediate refund for overpayment" in the amount of
$180,000.  The IRS did not credit the amount to
Finley's balance because of its prior knowledge of
Schweitzer's instruments.  The IRS had received more
than two hundred requests for refunds totaling
$64,000,000 and IRS workers knew that no refunds should
be issued.[3]  Finley submitted the IRS document on a
total of three separate occasions.

        After determining that the IRS and the banks would
not honor his documents, Finley embarked on an eight-
month quest to learn why the government agencies would
not honor what he believed to be valid financial
instruments.  Finley contacted in person or via mail,

3

facsimile, or telephone several state and federal agencies in an attempt to learn how to negotiate the instruments. Every response indicated that the instruments were the subject of a fraud alert, deemed without value, and should not be honored.

In mid-1996, Finley prepared a "media packet" detailing his efforts to cash the instruments. He entitled the document "Robin Hood and the 9 Hoods" and portrayed various government officials as "bad guys" for not cashing the documents. He distributed this packet to numerous network news programs and national newspapers. No media responded to his packets.

In April 1996, the FBI arrested Schweitzer and others, but not Finley, on multiple charges of fraud based on Schweitzer's seminars and instruments. Around this time, Finley ceased his pursuit to have the instruments honored. In June 1998, Finley testified at Schweitzer's trial in Montana. In his testimony he stated that the government had not prosecuted him for attempting to cash the instruments. This trial resulted in a hung jury. Prior to his testifying in the second trial of Schweitzer in October 1998, the government notified Finley that it would indict him. A grand jury formally indicted Finley on November 6, 1998.

[1]    Schweitzer led a group of people calling themselves the "Montana Freemen." Among other things, Schweitzer gave seminars on his version of the "common law." At the conclusion of these seminars, Schweitzer gave participants, such as Finley, fraudulent monetary instruments. The United States has prosecuted and convicted Schweitzer of various crimes.

[2]    Numerous alerts existed regarding Schweitzer instruments including: (1) a Postal Bulletin Fraud Alert dated December 7, 1995; (2) an Office of the Comptroller of the Currency (OCC) fraud alert dated September 8, 1995; (3) an OCC fraud alert dated November 20, 1995; (4) a California State Banking Department weekly bulletin dated November 11, 1995, addressing Schweitzer's instruments; and (5) an OCC fraud alert dated February 8, 1996.

[3]    The evidence indicated that certain persons who previously presented Schweitzer's instruments to the IRS had received about $17,000 in refunds.

United States v. Finley, 301 F.3d 1000, 1002-04 (9th Cir. 2002).

4

1

**PROCEDURAL HISTORY**

2      On July 7, 1999, a grand jury returned a five-count second
3  superseding indictment charging Finley in case number 98-cr-460-
4  WBS.   Count 1 of the indictment alleged that Finley submitted a
5  false claim to the Internal Revenue Service, in violation of 18
6  U.S.C. § 287, based on his request for refund for overpayment of
7  his taxes.  Count 2 alleged that Finley attempted to interfere
8  with the administration of the federal tax laws, in violation of
9  26 U.S.C. § 7212(a), based on his submission of a fraudulent
10  instrument to pay his taxes.  Counts 3 through 5 alleged that
11  Finley committed bank fraud, in violation of 18 U.S.C. § 1344(a),
12  based on two separate submissions of a $6 million fraudulent
13  instrument to the Bank of America, and to his submission of a
14  $150,000 fraudulent instrument to the holder of his mortgage.

15      On December 21, 1999, trial by jury commenced, and on
16  January 5, 2000, the jury found Finley guilty of Counts 1, 2, 4,
17  and 5.  On February 7, 2001, the Court sentenced Finley to 48
18  months in federal prison for each count, the sentences to be
19  served concurrently, for a total of 48 months in prison.  At that
20  hearing, the Court also dismissed Count 3.  Finley appealed to
21  the Ninth Circuit.  Finley moved to be released on bail pending
22  appeal, and the Court denied the motion.

23      Finley appealed his conviction and on August 20, 2002, the
24  Ninth Circuit reversed, holding that the trial court had erred
25  when it excluded the testimony of Dr. John J. Wicks, Finley's

1 proffered expert witness as to his mental state.  The case was

2 remanded for retrial.  The Ninth Circuit summarized pertinent

3 procedural history as follows:

4        On August 18, 1999, Finley's counsel filed notice
     under Fed. R. Crim. P. 12.2(b), informing the

5      government that it intended to introduce testimony
     "relating to a mental disease or defect or any other

6      mental condition" relevant to guilt.  The government
     made a discovery request for information about the

7      expert testimony.  In response, on October 1, 1999,
     Finley's attorney sent a letter to the government

8      summarizing the expert opinions of Dr. John J. Wicks.
     Dr. Wicks, a licensed clinical psychologist in

9      California, had examined Finley.  This letter
     represented that Finley "has an atypical belief system,

10      a system which is very rigid."  The letter also stated,
     "While Mr. Finley presents some indications of Shared

11      Psychotic Disorder (Folie a Deux), Dr. Wicks does not
     at present make that diagnosis.  Mr. Finley is not

12      suffering under any mental condition which is reported
     in the DSM IV [The Diagnostic and Statistical Manual of

13      Mental Disorders, 4th Ed., 1994]."
       In a second letter dated October 25, 1999,

14      Finley's counsel once again represented their intent to
     call Dr. Wicks at trial.  In pertinent part that letter

15      reads, "Mr. Finley's mental condition, as set forth by
     Dr. Wicks, will be presented at trial to show that Mr.

16      Finley did not have the intent to defraud, the
     requisite mens rea for the crime..."  Thereafter, the

17      prosecution moved under Fed. R. Evid. 704 to preclude
     Finley from relying on expert mental health testimony

18      at trial.  At the hearing on the motion, neither party
     sought an examination of the psychologist to qualify

19      that testimony under the *Daubert/Kumho Tire* [Daubert v.
     Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho

20      Tire v. Carmichael, 526 U.S. 137 (1999).] requirements.
     The government's contention was that Fed. R. Evid.

21      704(b) barred the testimony because it addressed an
     honestly-held "value system."

22        The court ruled that Dr. Wicks' testimony would be
     admissible and expressed its understanding that Dr.

23      Wicks could not testify about any element of the crime
     charged.  The court then advised counsel: "Then I think

24      the way to handle it is to be careful on examination
     and to make appropriate objections, Mr. McKeon [the

25      prosecutor].  If a question is asked that you feel

calls for Dr. Wicks to express an opinion about Mr.
Finley's actual belief or the sincerity of those
beliefs, you may object.  And then if he blurts it out,
move to strike, and I'll strike it."  Additionally, the
court instructed Finley's counsel to meet with Dr.
Wicks to "make it clear to him the areas that he's not
supposed to go into . . . so he has to stay within the
bounds of the Court's ruling on what's relevant."

     The parties proceeded to trial and the defense
called Dr. Wicks.  Dr. Wicks explained his thirty years
of experience in psychology including his extensive
experience in conducting psychological evaluations of
patients.  He stated that he spent two days with
Finley, including administering a battery of
psychological tests and interviewing him.  As a result
of the tests and examination, Dr. Wicks testified that
Finley has an atypical belief system.  Dr. Wicks
explained that most people have an open belief system
which is subject to change but some people have closed
belief systems.  Closed belief systems are more
abnormal because they are fixed and rigid.  Dr. Wicks
then testified how an atypical belief system operates.
Dr. Wicks testified: "It's a closed belief system in
which practical – or information from the real world
that comes in is so grossly distorted that the person
ends up with a belief system that the average person in
the culture just simply would sit back and say, 'Huh?
How can you believe that?'  If X, Y, and Z doesn't fit
with that, they would then come up with an explanation
how X, Y, and Z fit just fine with their belief
system."

     Dr. Wicks explained that a delusion is another
psychological term for an atypical belief system and he
stated there are three major categories of delusions.
Dr. Wicks opined that Finley was vulnerable to a
delusional disorder in December 1995, stating: "He
tends to hear what he wants to hear and believe what he
wants to believe about someone.  So this had happened
even prior to 1995."  The doctor concluded that Mr.
Finley suffered from a delusional disorder from a
minimum of 1995 until the present.  He elaborated that
a person with a delusional disorder can be dissuaded
from the delusion "only with tremendous, tremendous
difficulty."

     At this point, the government objected to Dr.
Wicks's testimony and moved to strike it as a discovery
violation.  After extensive discussion with counsel for
both parties, the court expressed the view that defense
counsel had sandbagged the prosecutor and the court.

Then the court decided to conduct a *Daubert* hearing
that afternoon before proceeding with trial.
. . .

At the conclusion of the *Daubert* hearing, the
district court ruled from the bench. The court
excluded the testimony on two grounds. It indicated
that either ground was sufficient to exclude the
testimony. First, under Fed. R. Evid. 702 the court
ruled that "the testimony would not be helpful to the
jury." The court indicated that the jury could
independently determine Finley's credibility. The
second ground for excluding the evidence struck the
testimony as a sanction for a Fed. R. Crim. P.
16(b)(1)(C) violation.

*Finley*, 301 F.3d at 1004-07 (citations and footnotes omitted,

italics in original). After remand, Judge Shubb, on whose

personal property Finley had recorded liens after the trial,

recused himself and the case was reassigned to Judge Levi.

Finley and the government waived their rights to trial by

jury. After a four-day bench trial, the Court acquitted Finley

of all charges on April 1, 2004. The Court found, in relevant

part, as follows:

The Cheek case from the Supreme Court [United
States v. Cheek, 498 U.S. 192, 202 (1991)] is what
dominates this area of the law, and it's not a case, I
will tell you, that I am fond of. I don't truly think
that I agree with it. I recall when it came out it
concerned me a great deal.

But I will follow it, Mr. Finley. I do not
practice nullification. Nullification is a two-way
street. It's the rule of law that we live by here. It
is that rule that protects individual freedom, it
protects order, and it protects you.

So the fact that I disagree with the Cheek case is
of no moment, because I've taken an oath to uphold the
law, and that is the law.
. . .

[Y]ou've asked me repeatedly over the weeks and
months earlier for a ruling on whether the warrants and

1   liens are valid.  I will tell you that these warrants
    and liens are not valid.
2
            . . .
            There does appear to be something very like mental
3   illness at work here in Mr. Finley's activities
    concerning these warrants.  Otherwise, I can't truly
4   explain to myself what happened here.
            After close consideration, I do have a reasonable
5   doubt under Cheek as to the willfulness of the
    defendant's conduct.
6           As to the bank fraud counts, I also have a
    reasonable doubt that any banker would reasonably be
7   influenced to part with money by relying on these
    patently false instruments.  In fact, both banks here
8   immediately rejected them.
            Therefore, I acquit Mr. Finley of all counts
9   against him.

10  Transcript of Verdict at 4-6, United States v. Finley, No. 98-460

11  (April 1, 2004).

12      On July 11, 2007, Finley filed a claim in the U.S. Court of

13  Federal Claims, pursuant to 28 U.S.C. § 1495, alleging his unjust

14  conviction and imprisonment.  The Court of Claims advised Finley

15  that he must first obtain a Certificate of Innocence from the

16  court that convicted him.  He then filed a request for such a

17  certificate from this Court on July 26, 2007.  On September 12,

18  2007, the Court of Claims stayed the case until this Court grants

19  or denies a Certificate of Innocence pursuant to 28 U.S.C. §

20  2513.

21

22                          **LEGAL CONTEXT**

23      28 U.S.C. § 1495 creates a cause of action providing

24  indemnification for those persons who, although actually innocent

25  of the charges brought against them, have suffered a deprivation

                                9

of their liberties by being unjustly convicted and imprisoned by

the federal government.

> The United States Court of Federal Claims shall have
> jurisdiction to render judgment upon any claim for
> damages by any person unjustly convicted of an offense
> against the United States and imprisoned.

28 U.S.C. § 1495.

28 U.S.C. § 2513 sets out specific prerequisites which must

be met in order to maintain this cause of action, providing:

> (a) Any person suing under section 1495 of this title
> must allege and prove that:
>     (1) His conviction has been reversed or set aside
> on the ground that he is not guilty of the offense of
> which he was convicted, or on new trial or rehearing he
> was found not guilty of such offense, as appears from
> the record or certificate of the court setting aside or
> reversing such conviction, or that he has been pardoned
> upon the stated ground of innocence and unjust
> conviction and
>     (2) He did not commit any of the acts charged or
> his acts, deeds, or omissions in connection with such
> charge constitute no offense against the United States,
> or any State, Territory or the District of Columbia,
> and he did not by misconduct or neglect cause or bring
> about his own prosecution.
>
> (b) Proof of the requisite facts shall be by a
> certificate of the court or pardon wherein such facts
> are alleged to appear, and other evidence thereof shall
> not be received.

28 U.S.C. § 2513.  The effect of these sections is to require

that the trial court must issue a Certificate of Innocence before

a § 1495 action can be maintained, and that the trial court has

the responsibility to decide whether the prerequisites of § 2513

have been met before such a Certificate can be issued.

1      28 U.S.C. § 1495 is akin to the Federal Tort Claims Act

2  (FTCA), 28 U.S.C. §§ 1346(b), 2671 et seq., in that it waives

3  sovereign immunity and creates a cause of action against the

4  government for what is much like the tort of false imprisonment.

5  This cause of action and its requisite Certificate of Innocence

6  is a "quintessentially civil action" whose purpose is to provide

7  for a suit against the government for damages caused by an unjust

8  conviction and imprisonment.  See Betts v. United States, 10 F.3d

9  1278, 1283 (7th Cir. 1992).  The Seventh Circuit further

10 described the civil nature of a Certificate of Innocence

11 proceeding by likening it to the "independent inquiry" to set

12 aside or correct a sentence under 28 U.S.C. § 2255.  Id.

13     The history of the Certificate of Innocence petition and the

14 intent behind the § 1495 cause of action are thoroughly discussed

15 in United States v. Keegan, 71 F. Supp. 623 (SDNY 1947).  Judge

16 Barksdale made the following findings about the procedural

17 requirements for a certificate of innocence:

18         The fact that this duty has been imposed upon the trial
           court, would create the inference that the court would
19         rely primarily on the record of the trial of petitioner
           had therein.  It would seem that other relevant facts
20         could be presented by affidavit. . . .  It would seem
           that rarely would it be necessary for the court to take
21         oral testimony, but I can see no objection to such
           procedure should it seem advisable.

22

23 Id at 637-38.  Proceedings for a Certificate of Innocence, then,

   contemplate that the District Court will review the existing
24

25

1  record, permit the parties to present new relevant evidence and
2  essentially conduct a bench trial on the issues raised.

3      As in any civil case it would appear that the burden of
4  proof is on the plaintiff. As the <u>Keegan</u> court observed, the
5  claimant

6          . . . is the moving party, who asks the court to find
           and certify a fact. It would seem to me obvious that
7          the burden is on the petitioner at least to the extent
           that the court should not grant the certificate unless
8          it is satisfied from the record before it that
           petitioner is altogether innocent.
9
   <u>Id</u> at 636. The Court does not believe, however, that Finley must
10
   prove his case beyond a reasonable doubt. This request concerns
11
   a criminal case, but is not a criminal case itself. In similar
12
   FTCA and § 2255 cases the plaintiff's burden of proof is by a
13
   preponderance of the evidence. The Court believes that should
14
   also be the case in this § 2513 proceeding. Cf <u>Griffin v.</u>
15
   <u>Sardella</u>, 253 Cal. App. 2d 937, 939 (1967)(negligence actions)
16
   and <u>Hearn v. United States</u>, 194 F.2d 647, 649 (7th Cir. 1952)(§
17
   2255).
18

19
                            **DISCUSSION**
20
        Finley has met one of the threshold requirements of § 2513
21
   for § 1495 relief in that the conviction that led to his
22
   imprisonment has been reversed and remanded, and on retrial he
23
   has been acquitted. Under our system, however, the result of
24
   this retrial is that he has been found to be not guilty, but he
25

                                 12

1  has not been found to be innocent.  That distinction was

2  recognized at the time this cause of action was created.

3  Attorney General Homer Cummings wrote the Senate Judiciary

4  Committee considering the bill, that:

5        . . . reversals in criminal cases are more frequently
          had on the ground of insufficiency of proof or on the
6        question as to whether the facts charged and proven
          constituted an offense under some statute.
7        Consequently, it would be necessary to separate from
          the  group of persons whose convictions have been have
8        been reversed, those few who are in fact innocent of
          any offense whatever.

9
   Letter to Chairman Henry F. Ashurst (May 7, 1935).  Under this
10
   system, the trial judge in this case has ruled that the
11
   government failed to meet its burden to prove willfulness beyond
12
   a reasonable doubt, not that Finley was innocent.  At the trial
13
   the government was required to prove, as an element of the crime,
14
   that as a matter of fact Finley had a guilty state of mind.  They
15
   failed to meet their burden of proof on this issue.  In this
16
   proceeding Finley must address the same issue and prove as a
17
   matter of fact that he had an innocent state of mind.  He must
18
   meet his burden of proof on this issue.
19

20
   A.    Innocence
21
        The central factual question in this proceeding is the same
22
   as it was in the previous trials - what was Finley's state of
23
   mind at the time of his conduct?  Virtually all the historical
24
   facts in the case are undisputed: Finley's long-term experience
25

13

1    and success in running his own law-related bookstore business;
2    Finley's goal to expand this business; Finley s sojourn to
3    Montana and his meeting with Leroy Schweitzer; what he was told
4    by Schweitzer; the specific documents he was given; what he did
5    with those documents - there are no factual disputes about these
6    matters.  It appears that the only significant evidentiary
7    dispute is based upon the differing opinions offered by the
8    expert mental health professionals.  Finley's expert, Dr. John J.
9    Wicks, examined him and concluded that he has an abnormal mental
10   condition - an "atypical belief system" that is "fixed and
11   rigid."  The government expert, Dr. Bruce Walter Ebert, also
12   examined Finley and concluded there was nothing abnormal about
13   him, also pointing out that the current "bible" for mental
14   disorders, the Diagnostic and Statistics Manual, DSM IV, does not
15   include any reference to an "atypical belief system" as a mental
16   disorder.  Resolving this particular factual dispute, however,
17   will not resolve the case itself as Finley's belief system,
18   whatever it may be, does not tell us the content of his beliefs.

19       Crimes are composed of both an act and an intent, and that
20   is the case here.  Finley has in fact acted in a way that could
21   be criminal, but his act is lawful or unlawful depending upon his
22   accompanying state of mind.  To be guilty of a crime Finley must
23   act willfully, that is with a belief that the instrument he is
24   presenting for payment is in fact fraudulent, that it is not a
25   valid financial instrument.  In the applicable legal context as

14

1  set forth by the U.S. Supreme Court in the Cheek case, the judge
2  in his bench trial found that the government had not met its
3  burden to prove beyond a reasonable doubt the fact that Finley
4  acted with a willful state of mind.

5        In the Cheek case, John Cheek, a commercial airline pilot,
6  was indicted on charges of failure to file and of evading his
7  income taxes.  Cheek v. United States, 498 U.S. 192, 193-94
8  (1991).  The government was required to prove that his conduct
9  was willful.  Id at 193.  Cheek maintained that he had a good
10 faith belief that these income tax laws did not apply to him.  Id
11 at 196.  He was convicted by a jury that had been instructed by
12 the trial court that willfulness was the voluntary and
13 intentional violation of a known legal duty, and that an honest
14 but unreasonable belief is not a defense.  Id at 197-98.  The
15 Seventh Circuit affirmed the conviction explaining that a good
16 faith misunderstanding negates willfulness only if it is
17 objectively reasonable.  Id at 198.  The Supreme Court disagreed
18 with the Seventh Circuit and reversed, holding that in a case
19 where the fact finder believes that the defendant's claim of a
20 good faith belief is true, then the government has not proved
21 willfulness however unreasonable that belief may be.  Id at 201-
22 04.

23       Cheek untethers reasonableness and willfulness.  They are
24 different issues to be decided separately.  Conduct found to be
25 unreasonable can, at the same time, be found to be conduct which

1 has been carried out lawfully in good faith. Although his
2 general verdict did not include a specific finding on
3 reasonableness, it is apparent that this troubled Judge Levi. No
4 matter how unreasonable Finley's conduct may have been, the
5 government was separately required to prove that it was
6 criminally willful, and he concluded that they had failed to meet
7 their burden of proof on that issue.

8    In this proceeding, Finley has the burden of proving his own
9 innocence. It would appear that the Cheek rule applies here
10 also. Whether or not one is willful remains untethered from
11 whether or not one is reasonable. Finley can be found to be
12 innocent whether he is reasonable or unreasonable. As it could
13 in deciding guilt, a fact-finder can consider reasonableness in
14 deciding innocence, but it is an evidentiary factor only. The
15 finder of fact must make separate decisions on the ultimate
16 question of the state of mind that determines guilt or innocence.

17    This Court is the fact-finder for the purposes of this
18 petition. To make the record clear, the Court finds on this
19 evidentiary record that Finley's conduct was objectively
20 unreasonable. A reasonable person returning from Montana with
21 the paper instrument given to him by Schweitzer would not believe
22 that this piece of paper created the lawful authority to require
23 the Bank of America to put $6 million into his personal account.
24 The Court has already discussed the testimony about Finley's
25 "atypical belief system" and noted that whether or not Finley has

1   such a belief system does not tell us whether or not he acted
2   willfully.  Finley could return from Montana and believe that he
3   was given a document worth $6 million or he could believe that in
4   reality the document was worthless.  It may be that he is fixed
5   and rigid about whichever belief he chooses but that does not
6   compel him to accept one belief or the other.

7       The ultimate question for the Court is whether or not Finley
8   has proven that he is innocent.  As already noted he can be found
9   to be both unreasonable and innocent, but he still has to prove
10  the fact of his innocent state of mind.  The fact that he has
11  acted unreasonably does not resolve that question but it
12  obviously offers little or no support to his argument that he is
13  innocent.

14      In each of his trials Finley maintained that he believed the
15  documents were valid negotiable instruments when he passed them
16  to the bank, the IRS, and his mortgage-holder.  In this
17  proceeding Finley maintains that he still believes they are
18  valid.  This month Finley filed another in pro per brief.  In
19  this brief he argues that an exhibit called "Public [sic]
20  Contract and the UCC," which he has already filed with the Court,
21  proves that the warrants of LeRoy Schweitzer are valid.  This
22  exhibit is a 26 page treatise on negotiable instruments and the
23  Uniform Commercial Code by someone, described in the exhibit as
24  "Douglas Leiter, J.D."  There is no further information about the
25  source of the exhibit; it contains no discussion of the

17

1  Schweitzer warrant; and its text clearly does not prove that the
2  warrants are valid.  It is troubling to the Court that even after
3  he has been rejected in every instance where he has tried to
4  negotiate these documents, and even after Judge Levi, in response
5  to his repeated requests, specifically told him that they were
6  invalid, that in this proceeding, Finley would tell this Court
7  that it is his personal state of mind that these warrants are
8  valid.

9      The latest brief also endeavors to answer an argument by the
10  government that he did not believe the warrants were valid.  In
11  his testimony at the first trial Finley was asked whether his
12  knowledge about Schweitzer's arrest raised any doubts in his mind
13  about the validity of the warrants.  Finley answered by saying,
14  "I would imagine it probably did raise questions in my mind, and
15  I did it anyway."  Finley argues that this does not show doubts
16  in his mind, but rather that he was actually explaining that the
17  government had produced no evidence or proof that the warrants
18  were invalid.  Asking for proof of validity is something Finley
19  has focused on since he first obtained the warrants.  In
20  assessing the significance of this focus as to Finley's state of
21  mind, it should be noted that trying to find whether or not there
22  is proof of the validity of the warrants is the same as trying to
23  find the answer to the question of whether or not the warrants
24  are valid.  There would also seem to be a question as to whether
25  Finley's asserted search for proof was bonafide.  As we have

1  already seen, whenever he has been presented with proof of
2  invalidity he has refused to acknowledge it.

3     Finley also maintained that none of his conduct could be
4  described as fraudulent as he had simply presented the warrants
5  as is and made no misrepresentations about them.  He maintains
6  that under these circumstances, if the warrant recipient simply
7  turned the warrant down there would be no harm to the recipient,
8  no deceit on his part, and therefore no fraud committed.  An
9  implicit premise of this statement is that 'even if I believe the
10 warrants are invalid there will be no harm or deceit if I simply
11 present them and they are turned down.'  The Court has difficulty
12 interpreting the paradox of Finley's arguments - that he believed
13 in the warrants validity but simultaneously believed the
14 financial institutions were free to turn them down - as anything
15 more than an expression of doubt on this issue.

16    Trying to discover an explanation for Finley's conduct in
17 this case, trying to ascertain the truth as to his state of mind
18 when he carried out that conduct, has proven to be a difficult
19 and elusive quest.  It is Finley's burden to answer these
20 questions.   The burden of proof in this case is not beyond a
21 reasonable doubt, but it is still a burden of proof that must be
22 met.  On this record the Court finds that, just as the evidence
23 is not sufficient to show the existence of a willful state of
24 mind, it is not sufficient to show that a willful state of mind

25

19

1 | did not exist, and that the petitioner has not met his burden of
2 | proof and has not established that his conduct was innocent.

3

4 | **B. Neglect**

5 |     There is another, separate reason for denying a Certificate
6 | of Innocence to Finley. As already cited, 28 U.S.C. § 2513
7 | provides that a Certificate can not be granted unless the
8 | plaintiff can establish that "he did not by misconduct or neglect
9 | cause or bring about his own prosecution." § 2513(a)(2).

10 |     As the Seventh Circuit observed in Betts:

11 |     the statute expressly requires a causal connection
    between petitioner's conduct and his prosecution; it
12 |     does not preclude relief simply because the petitioner
    engaged in misconduct or neglect, period.

13 | 10 F.3d at 1285. A defendant's action constitutes neglect or
14 | misconduct where he:

15 |     has it within his means to avoid prosecution but elects
16 |     not to do so, instead acting in such a way as to ensure
    it. In that sense, he is responsible for his own
17 |     prosecution and deserves no compensation for his
    incarceration.

18 | Id at 1285.

19 |     Each of the crimes charged in this case require that the
20 | accused defendant carry out an act of presenting a document for
21 | payment. Finley did in fact commit those acts knowingly and
22 | intentionally. But, as we have seen, commission of those acts
23 | does not in and of itself establish that a crime has been
24

25

committed.   There must be an accompanying culpable state of mind of the actor.

A culpable state of mind cannot be established by the percipient witness testimony of another person but must be established by a set of circumstances that provide a permissible and persuasive inference of that culpable state of mind.   Finley chose to commit the act when he was aware of a set of circumstances that would permit such an inference, a set of circumstances that would permit a fact finder to find willfulness.

Moreover, the set of circumstances supports a finding that his acts were objectively unreasonable, which is to say that he had at least a negligent state of mind when he acted.   Cheek does not effect this conclusion as it cannot untether reasonableness and negligence.   Whether or not one is negligent is defined by whether or not one acts reasonably.   Unreasonable conduct is the essence of negligence.   See Ramirez v. Plough, 6 Cal. 4th 539, 546 (1994).

> A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or failed to do something that a reasonably careful person would do in the same situation.

1-400 CACI 401 (Judicial Counsil of California Civil Jury Instructions, 2008).

Under the circumstances it would appear that Finley acted through neglect and he has not proven that he "did not by . . .

1  neglect cause or bring about his own prosecution," as required by

2  § 2513.

3

4                           **CONCLUSION**

5      For the foregoing reasons, the Court denies Finley's

6  petition for a Certificate of Innocence.  Finley did not meet his

7  burden of proof that the acts he committed were not accompanied

8  by willfulness.  In addition, he did not prove that he did not

9  bring about his own prosecution by his own neglect.

10

11     IT IS SO ORDERED

12

13  Date: June **23**, 2008          By _____

14                                   D. LOWELL JENSEN

15                                   United States District Judge

16

17

18

19

20

21

22

23

24

25